# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

**LONNIE L. JACKSON**,
        **Plaintiff,**
    **v.**                                 **Case No. 17-C-0627**

**CO II OFFICER KUEPPER, et al.,**
        **Defendants.**
_____

## DECISION AND ORDER

Plaintiff Lonnie L. Jackson is a *pro se* transgender Wisconsin state prisoner who identifies as female. She filed this action under 42 U.S.C. § 1983 alleging that defendants violated her constitutional rights. (Docket No. 1.) Plaintiff has moved for leave to proceed without prepayment of the filing fee (*in forma pauperis*) (Docket No. 2), to appoint counsel (Docket No. 4), and to allow the use of her release account for copies, postage, and other litigation expenses for this lawsuit (Docket No. 9). This order screens plaintiff's complaint and resolves her motions.

### I.   Motion for Leave to Proceed Without Prepayment of the Filing Fee

The Prison Litigation Reform Act (PLRA) applies to this case because plaintiff was incarcerated when she filed her complaint. 28 U.S.C. § 1915. The PLRA allows a court to give an incarcerated plaintiff the ability to proceed with her lawsuit without prepaying the case filing fee, as long as she meets certain conditions. One of those conditions is that plaintiff pay an initial partial filing fee. 28 U.S.C. § 1915(b).

Plaintiff has been assessed and paid an initial partial filing fee of $.97. *See* 28 U.S.C. § 1915(b)(1). Therefore, I will grant her motion to proceed without prepayment of the filing fee.

## II.  Screening Plaintiff's Complaint

I am required to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). I must dismiss a complaint or portion thereof if the prisoner has raised claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b).

To state a cognizable claim under the federal notice pleading system, plaintiff is required to provide a "short and plain statement of the claim showing that [she] is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). It is not necessary for plaintiff to plead specific facts and her statement need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). However, a complaint that offers mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). To state a claim, a complaint must contain sufficient factual matter, accepted as true, "that is plausible on its face." *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when [] plaintiff pleads factual content that allows the court to draw the reasonable inference that [] defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The complaint's allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted).

In considering whether a complaint states a claim, I follow the principles set forth in *Twombly* by, first, "identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. Legal conclusions must be supported by factual allegations. *Id.* If there are well-pleaded factual allegations, the court must, second, "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must allege that: 1) she was deprived of a right secured by the Constitution or laws of the United States; and 2) the deprivation was by defendants acting under color of state law. *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009) (citing *Kramer v. Village of North Fond du Lac*, 384 F.3d 856, 861 (7th Cir. 2004)); *see also Gomez v. Toledo*, 446 U.S. 635, 640 (1980). I am obliged to give plaintiff's *pro se* allegations, "however inartfully pleaded," a liberal construction. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

## A. Complaint's Allegations[1]

At all times relevant to this complaint, plaintiff was an inmate at Oshkosh Correctional Institution (OCI). Defendants Range Correctional Officer II Officer Kuepper, Sergeant Keller, Lieutenant Norman, Center Director Chris Kunchinski,[2] Deputy Warden

---

[1] Plaintiff asserts an interaction with "defendant Zanon" regarding her medical ice bag incident, but Zanon is not a named defendant.

[2] Plaintiff spells this defendant's name as "Kuchinski" in other places in her complaint.

Robert Hable, Warden Judy Smith, Captain Haas Kuster,[3] Correctional Officer III Sergeant West, and Inmate Complaint Examiner Teresa Murphy were employed at OCI. Defendants Secretary Jon Litscher, Former Secretary Edward Wall, and Deputy Secretary Cathy Jess were employed at the Department of Corrections (DOC). Defendant Administrator James R. Schwochert was employed at the DOC's Division of Adult Institutions (DAI).

### 1. Industrialized Hand Soap in Plaintiff's Medical Ice Bag

Plaintiff alleges the following facts. On April 25, 2017, plaintiff asked defendant Kuepper to fill her medical ice bag with ice in accordance with her medical restriction. At the time, OCI used dark blue bags for their medical bags. Docket No. 1 ¶ 12. Defendant Kuepper took the bag and returned it to plaintiff half full of ice. Plaintiff placed the bag on her back and went to sleep.

By about 3:00 a.m., the ice in the bag had melted, and plaintiff was awakened by its leaking contents. She removed the bag from her bed. And because she was thirsty, she drank some of its contents and then went back to sleep.

Moments later, plaintiff began feeling pains in her stomach, lightheaded, dizzy, and "quizzy." Docket No. 1 ¶ 4. She vomited twice. After which she noticed "a great deal of 'bubbles' in the toilet water." *Id.* She reviewed the medical ice bag contents and surmised that the bag contained "industrial hand sanitizing hand soap" (soap), a product used throughout the institution for cleaning. *Id.*

---

[3] Plaintiff spells this defendant's name as "Bass Kuster" and as "Hass Kuster" in other places in her complaint.

Plaintiff spoke with a third shift range officer about what had happened and asked him if the use of soap in medical ice bags was a practice. Docket No. 1 ¶ 5. The range officer said that it was common practice to use salt and pepper in medical ice bags to prevent abuse but not soap or any other products. The range officer also stated that the officer is supposed to inform the inmate of any additives he may have put in the bag prior to giving it to the inmate.

Plaintiff knew that using the medical ice bag for purposes other than prescribed is a prison violation that could result in the cessation of her use. She, however, did not know that drinking the melted ice—thus after having used the medical ice bag for its intended purpose—was a purported violation as well. According to plaintiff, nothing in the DOC policies or the Bureau of Health Services Operational Manual makes this kind of restriction known to an inmate who is issued a medical ice bag.

After the range officer left plaintiff's cell, plaintiff vomited once more and then informed the housing sergeant of what had happened and how she was not told that soap had been put into her medical ice bag. Plaintiff asked the sergeant to inform the health services unit (HSU) right away. He did, and he also wrote an incident report for the matter but did not identify the range officer with whom plaintiff initially spoke.

At about 6:30 a.m., plaintiff was evaluated by medical staff, including Registered Nurse Cory (not a defendant). Cory explained to plaintiff that he had contacted poison control regarding plaintiff's ingestion of the soap and was told that plaintiff would simply have to let the soap pass through her system. There was nothing else that could be done. Cory told plaintiff that she would be sick for three to seven days but that she was

to let the HSU know if her symptoms worsened or if she became very ill so that they could provide further treatment.

At the time, plaintiff was taking "feminizing hormones," "psychotropic medication," high blood pressure medication, diabetic medication, and pain medication, and so she asked Cory about the effects the soap ingestion would have. Docket No. 1 ¶ 32. Cory stated he would monitor plaintiff's progress. Plaintiff was returned to her cell.

Later that day, defendant Kuepper came to plaintiff's cell smiling and laughing. He asked plaintiff whether she drank from the medical bag. When plaintiff responded yes, defendant Kuepper admitted to putting the soap in plaintiff's medical bag. After plaintiff told defendant Kuepper that she had gotten very sick from it, defendant Kuepper responded "oh well, you should not have drunk the water from the medical bag." Docket No. 1 ¶ 10. Plaintiff asked defendant Kuepper why he did not tell her about the soap. Defendant Kuepper responded that he did not have to tell plaintiff anything and that he is allowed to put whatever he wants in the medical ice bags to prevent abuse of the privilege. Plaintiff asserted that under the DOC policy and Wisconsin law she had a right to know what was in the medical bag. Defendant Kuepper again stated that he did not have to tell her anything and that plaintiff would find out when she drank it. He also stated that if he really wanted to poison plaintiff, "[he] would have used 'rat poison.'" *Id.* Defendant Kuepper further asserted that it was just soap and that plaintiff was making a big deal out of it.

Plaintiff notes that at no time did defendant Kuepper tell his supervisors that he witnessed plaintiff abusing her medical ice bag privilege and no other staff had informed

defendant Kuepper that plaintiff had been caught abusing her medical ice bag privilege. Plaintiff states that defendant Kuepper caused her injury and suffering because she is African American and transgender. She asserts that defendant Kuepper made it known that he dislikes African Americans and transgender people. He sees African Americans as "drug dealers poisoning his community," and he dislikes transgender people because they want to be the opposite sex but are not. Docket No. 1 ¶ 33.

Plaintiff subsequently wrote a formal complaint to defendant Smith seeking to file criminal charges against defendant Kuepper regarding the incident. She also filed an inmate complaint.

Plaintiff received a memorandum from defendant Smith about the formal complaint. It told plaintiff that the warden's "office will take no further action on the issue because [] plaintiff filed an inmate complaint, citing that it would be inappropriate for her to discuss the matter outside of the ICRS system." Docket No. 1 ¶ 13.

After her inmate complaint investigation got underway, defendant Murphy informed plaintiff that her complaint would "probably be dismissed pursuant to DOC Executive Directive 16 'Confidentiality Reasons.'" Docket No. 1 ¶ 12. The complaint was dismissed due to "confidentiality policy protecting DOC staff." *Id.*

The blue medical ice bags were subsequently changed to clear. Also, defendant Kuepper left the institution for a sergeant position at another unknown institution.

In May 2015, plaintiff filed a formal complaint with defendant Wall requesting a full investigation regarding "plaintiff's poisoning." Docket No. 1 ¶ 14. Defendant Wall did not take any action.

In June 2015, plaintiff wrote a letter to defendant Jess explaining the incident and requesting to press charges against defendant Kuepper for assault. Plaintiff received no response from defendant Jess's office.

Plaintiff also sent a letter regarding the incident to each of the following agencies: Oshkosh District Attorney's Office, Oshkosh Sheriff Department, and Oshkosh Police Department. In those letters, plaintiff requested a criminal Investigation and to be interviewed for possible criminal charges against defendant Kuepper.

On August 19, 2015, Detective Paul Frey (not a defendant) came to the institution to see plaintiff and conducted a criminal interview. Frey told plaintiff that his office would get back in touch with her once the investigation was completed. He asked plaintiff to send him any documentation she had relating to the incident. Plaintiff complied. Weeks later, Plaintiff received a letter from Frey stating that the matter was investigated but the Deputy District Attorney Scott A. Ceman (not a defendant) decided not to file criminal charges.[4]

On September 2, 2015, the Corrections Complaint Examiner Deputy Secretary Morgan (not a defendant) issued a decision regarding plaintiff's complaint directing the OCI to place it on the "prioritized investigation list" citing that the institution failed to follow the DOC policies. Docket No. 1 ¶ 18. However, according to plaintiff, the correctional officers continued to put dangerous chemicals in inmates' medical ice bags.

---

[4] Plaintiff provides an example of Ceman's history of refusing to file criminal charges against correctional staff unless the institution's complaint department makes a formal request to the warden of that institution for criminal charges to be filed. Docket No. 1 ¶ 15. Plaintiff also discusses a conversation she had with OCI's Lead investigator Captain Tony (not a defendant), who affirmed this practice. *Id.*

Morgan also recommended that plaintiff's complaint against defendant Kuepper be dismissed "as standard practice of complaints against institutional staff." *Id.*

On September 15, 2015, plaintiff spoke with defendant Murphy about the practice of allowing officers to put dangerous chemicals into medical ice bags. Defendant Murphy said that there is no such policy that allows for that to happen but that if the act occurs then the officer can be liable for any injury sustained by the inmates. She stated that correctional staff are allowed to use products like "salt or pepper" as preventive measures, so as long as the inmates do not suffer from any allergies relating to pepper. Defendant Murphy also said that the officers still have to consult with medical staff before placing this kind of substance into the medical ice bag. But defendant Murphy further added that inmates need not be told that they cannot drink out of the medical ice bags. She said it should be "common sense." Docket No. 1 ¶ 20.

In November 2015, while plaintiff was being seen for her scheduled diabetic insulin appointments, she asked the HSU staff about whether officers can place substances in medical bags. The staff explained that the use of any chemical in medical ice bags other than ice is prohibited. If abuse of medical ice bags is suspected, the officer is instructed to call the HSU and let the HSU deal with the matter. The staff further noted that there is no written policy instructing inmates on what to do with the melted ice from the medical ice bag.

Also in November 2015, plaintiff spoke with Housing Unit Supervisor Jenny Delvaux[5] (not a defendant) about whether there is an OCI policy authorizing the use of

_____

[5] Plaintiff refers to Jenny Delvaux as the "housing unit director" in other places in her complaint

soap in medical ice bags. Delvaux stated that to her knowledge there is no such policy but was generally unsure as to whether such a policy existed. She stated, however, that she did not understand why it was so important for the inmates not to drink the water that was left from the melted ice. During a conversation with Delvaux later that same month, Delvaux stated that it would be "dumb" for an officer to use soap on an inmate because the officer would not know the inmate's overall health condition to make a dangerous decision. Docket No. 1 ¶ 38. Delvaux stated that the officers she spoke with said that they would never use soap in a medical ice bag.

At some point, plaintiff met with defendant Hable about the use of soap in medical ice bags. Hable supported its use. He stated that it was a practice and custom to curtail medical ice abuse and that the product does no harm to inmates. When plaintiff informed Hable of the ill effects she suffered from the soap, Hable replied, "then I guess you will not drink the water again would you Mr. Jackson." Docket No. 1 ¶ 41.

At some point, plaintiff also spoke with defendant Kuster about her medical ice bag incident. Defendant Kuster stated that he was not stopping the practice in the segregation unit. He further said that training the staff on handling medical ice bags was not his area but the HSU's. He said "his job [was to] deal with security." Docket No. 1 ¶ 34. He further stated, "I train my staff the way they are to be trained, and [plaintiff has] no input into how that's done." *Id*.

Plaintiff's other alleged facts regarding the medical ice bag are conflicting and murky, at best. She asserts generally that she spoke with defendants, and they refused to stop the use of dangerous cleaning products in medical ice bags. She states that the

defendants see nothing wrong with the methodology and that if plaintiff does not drink the medical ice bag contents then she has nothing to worry about. Plaintiff says that the defendants claim the practice is to teach plaintiff a lesson regarding following the rules.

Plaintiff then states that at some point, she was told that it was not the policy of the segregation housing unit to allow officers to put whatever they chose into medical ice bags and that defendant Kuepper did not have verbal or written authority to do what he did. But since "they were not there, there was nothing that could be done to correct the matter." Docket No. 1 ¶ 34.

Plaintiff alleges that defendants are hiding behind the DOC policy of "Confidentiality" for not doing anything to stop the practice of harming inmates. Docket No. 1 ¶ 43. She states that they use the terms "in the interest of institutional security" and "need to know basis" to keep from sharing information regarding the investigation. *Id.* Plaintiff alleges that "every one of these defendants neglected their responsibility" and failed to address "a serious problem that caused plaintiff to be both harmed and injured." Docket No. 1 ¶ 43.

Plaintiff further states that all of the administrators could have stopped the abuse that she was receiving but failed to do so because of what is known throughout the prison community as a "Code of Silence" among Correctional Staff of the Department of Corrections. *Id.* No officer is held accountable for their actions, even if it does cross the line into criminal activities.

## 2. All Defendants' Gender Discrimination

Plaintiff alleges that all of defendants, with the exception of defendants Jess, Schwochert, and Wall, treated plaintiff differently because she is transgender. Docket No. 1 ¶ 21. They were all fully aware that plaintiff is transgender, and plaintiff had been housed on the P-Building Housing unit—the transgender unit—since she had come to OCI.

### 3. Defendant West's Race Discrimination

Plaintiff alleges that defendant West, who is Caucasian, treated her differently because she is African American. Defendant West was on staff in the P-Building, and at that time, the P-Building housed mostly white transgender inmates.

Defendant West made it known to others that she disliked African Americans. She refused to deal with African American inmates. She would turn her back and walk away from those inmates without saying a word. Defendant West would not address African American inmates' concerns and delegated those duties to other officers.

Plaintiff relayed this disparate treatment to defendant Kunchinski, who is also Caucasian. He said he would speak to defendant West about this treatment because it is not allowed in his unit. But defendant West continued to deal with African American inmates in the same manner.

At some point, plaintiff caused a disruption concerning a mix up of her special diet from the HSU. The confrontation purportedly involved defendant West. In response to that disruption, plaintiff was put into segregation housing.

After plaintiff completed her time in segregation, defendant West had her placed in W-Building, which is a general population unit that did not have any transgender

inmates at the time of plaintiff's placement. Defendant Kunchinski's response to plaintiff's query regarding her move from P-Building to W-Building was that "the staff is afraid of you because they feel that you'll sue them and one way to get past this, be quiet, and don't complain a lot, just do your time, and leave, and stop suing correctional staff." Docket No. 1 ¶ 21. He further explained that defendant "West [] does not like you, and she is afraid of you." Docket No. 1 ¶ 23. When plaintiff asked defendant Kunchinski what plaintiff had done to defendant West, he stated that defendant "West told him that the last time plaintiff was on her unit, [plaintiff] assaulted [defendant] West by way of 'shoulder checking her in an aggressive manner.'" *Id.* Defendant West then felt threatened by plaintiff. Plaintiff asserted that she never touched defendant West and that defendant West was lying. Plaintiff also asked why defendant West did not report the alleged assault to the supervisor. Defendant Kunchinski stated that he did not know why defendant West refused to report the alleged assault, but in any event plaintiff was not allowed back on the unit. Plaintiff was moved to W-Building in May 2015.

Plaintiff went to Delvaux, the housing unit supervisor, and made a request that she be sent back to the P-Building. Delvaux asked plaintiff why she wanted to be transferred back to that unit. Plaintiff told Delvaux what defendant Kunchinski said regarding defendant West. Delvaux said she would speak to Kunchinski about the matter and see what she could do to get plaintiff back to P-Building.

On July 1, 2015, plaintiff was transferred back to P-Building. Plaintiff was later warned by defendant Kunchinski "to stay clear" of defendant West because she was not happy plaintiff had returned to the unit. Docket No. 1 ¶ 24.

13

Plaintiff filed an inmate complaint alleging both racial and gender discrimination against defendant West. Plaintiff's complaint was rejected by defendant Murphy. Defendant Murphy found nothing was wrong with plaintiff's treatment on the unit.

While plaintiff was in P-Building, she stayed in her cell fearful that defendant West was out to make trouble for her. Whenever defendant West wanted to tell plaintiff to do something, she would scream plaintiff's name, an action defendant West did not do to the other inmates. When plaintiff was outside of her cell, defendant West closely watched plaintiff. She also did not address plaintiff with gender neutral names in accordance with DAI guidelines regarding transgender inmates. Plaintiff reported this to defendant Kunchinski, who told plaintiff that he would have a talk with defendant West. But he also said that because plaintiff was in a male institution neither he nor the administration can make the staff comply with the new policies. Defendant Kunchinski further stated that it is not mandatory for the staff to address the inmate with gender neutral names.

Nevertheless, because of her fear of being retaliated against and further harassed by defendant West, plaintiff limited her contact with defendant West by refusing to take her prescribed medication.

Sometime during the month of October 2015, defendant Kunchinski told plaintiff that she was again being moved to W-Building at the request of defendant West. The reason for the move was that defendant West was afraid of plaintiff. That fear was again based on the incident regarding plaintiff's alleged assault of defendant West. Plaintiff

again told defendant Kunchinski that the alleged assault never happened. Defendant Kunchinski agreed but told plaintiff that it was his job to make his staff happy.

Plaintiff was moved to W-Building on October 14, 2015. Two days later, plaintiff was moved back to the P-Building by Delvaux. When defendant West saw plaintiff was back, she became very angry. She went to defendant Kunchinski and demanded that plaintiff be sent back to W-Building so that all of the transgender inmates were no longer housed on her unit.

Later when plaintiff met with defendant Kunchinski, he stated he had no problem with her, but that defendant West did not want her there because she feared for her safety. Notwithstanding plaintiff's repeated assertion that she did not harm defendant West and the fact that Delvaux—a person in authority over defendant Kunchinski—had moved plaintiff back to P-Building, defendant Kunchinski stated he would move plaintiff back to W-Building. Defendant Kunchinski said that the move would not only be because of defendant West's claim of fear but also because of plaintiff's poor behavior. Plaintiff, however, had not gotten into trouble on the unit and did not have any write-ups from other staff.

On October 30, 2015, Defendant Kunchinski again made plaintiff relinquish her job on the unit and moved her back to W-Building.

Because plaintiff was the only transgender inmate in W-Building, maintenance installed a "false shower setup" on the unit so the plaintiff could shower. Docket No. 1 ¶ 30. The plaintiff, however, was only allowed to shower once a day, either between 5:30 a.m. to 6:00 a.m. or 10:00 p.m. to 10:30 p.m. She was not allowed to shower at the

same time as the other transgender inmates in the institution, who were allowed to shower either between 2:15 p.m. to 2:45 p.m. or 10:00 p.m. to 10:30 p.m.

Ultimately, plaintiff was subjected to Delvaux and defendant Kunchinski's housing rotation plan where plaintiff was moved back and forth from P-Building to W-Building every 90 days. This was to ensure plaintiff would not "get on the other staff['s] nerves." Docket No. 1 ¶ 30.

Delvaux and defendant Kunchinski consider plaintiff a "Jailhouse Lawyer," and plaintiff is being targeted because of what she knows about the DOC's polices, rules and regulations. *Id.* Plaintiff asserts that she is also being targeted because she is outspoken about those who infringe on her constitutional rights and liberties.

Plaintiff seeks declaratory and injunctive relief as well as compensatory and punitive damages.

### B.  Court's Analysis

Based on these allegations, plaintiff is attempting to improperly bring unrelated claims in a single case.  The Seventh Circuit instructs that under the controlling principle of Rule 18(a) of Federal Rules of Civil Procedure "[u]nrelated claims against different defendants belong in different suits" so as to prevent prisoners from dodging the fee payment or three strikes provisions in the Prison Litigation Reform Act. *George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007). Specifically, Rule 18(a) provides that "[a] party asserting a claim, counterclaim, crossclaim, or third-party claim may join, as independent or alternate claims, as many claims as it has against an opposing party." Fed. R. Civ. P. 18(a). Under this rule, "multiple claims against a single party are fine, but

Claim A against Defendant 1 should not be joined with unrelated Claim B against Defendant 2." *George*, 507 F.3d at 607.

Moreover, the court in *George* reminded district courts that Rule 20 of the Federal Rules of Civil Procedure, applies as much to prisoner cases as it does to any other case. *Id*. Under Rule 20, joinder of multiple defendants into one action is proper only if "they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20.

I find that the complaint violates both Rules because it advances at most two unrelated claims against multiple defendants. Plaintiff's primary claim seems to be an Eighth Amendment claim of deliberate indifference against defendant Kuepper for his alleged act of putting soap in her medical ice bag. Plaintiff seems to assert the same claim against the other defendants. Yet, she does not allege any facts regarding the other defendants' personal involvement in the medical ice bag incident, which is a requirement for stating a claim under section 1983. *Morfin v. City of East Chicago*, 349 F.3d 989, 1001 (7th Cir. 2003). Plaintiff then seems to insert a second constitutional claim of a violation of her Fourteenth Amendment equal protection rights against defendants West and Kunchinski and another individual that is not a named defendant, Delvaux.  This claim is based on defendant West's alleged discriminatory acts against plaintiff that were purportedly condoned and facilitated by defendant Kunchinski and Delvaux.

As instructed by the *George* court, such "buckshot complaints" should be "rejected." *Id.* Plaintiff will be allowed to file an amended complaint incorporating only properly related claims. Such amended complaint must be filed on or before **April 12, 2018**. Failure to file an amended complaint within this time period may result in dismissal of this action. Any unrelated claim not pursued in this case may be brought in a separate action.

Plaintiff is further advised that because an amended complaint supersedes a prior complaint, any matters not set forth in the amended complaint are, in effect, withdrawn. *See Duda v. Bd. of Educ. of Franklin Park Pub. Sch. Dist. No. 84*, 133 F.3d 1054, 1056 (7th Cir. 1998). The amended complaint must bear the docket number assigned to this case and must be labeled "Amended Complaint." If plaintiff files an amended complaint, it will become the operative complaint in this action, and I will screen it in accordance with 28 U.S.C. § 1915A.

I also advise plaintiff that 42 U.S.C. § 1983 "creates a cause of action based on personal liability and predicated upon fault; thus liability does not attach unless the individual defendant caused or participated in a constitutional violation." *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996). Additionally, the doctrine of respondeat superior (supervisory liability) does not apply to actions filed under 42 U.S.C. § 1983. *See Pacelli v. deVito*, 972 F.2d 871, 877 (7th Cir. 1992). Indeed, section 1983 does not create collective or vicarious responsibility. *Id.* Thus, with respect to any claim or claims advanced in plaintiff's amended complaint, she *must identify* the individual defendants

and specify the manner in which their actions, or failure to take action, violated her *constitutional rights*.

### III. Motion to Appoint Counsel

In her motion to appoint counsel, plaintiff asserts that she is unable to sufficiently litigate her case because her incarceration limits her access to the internet and the number of medical claims against each defendant along with the number of defendants makes this case factually complex. Plaintiff also states that the anticipation of conflicting opinions and facts and her limited knowledge of the law warrant the appointment of counsel. Plaintiff asserts that counsel would also be able to secure information outside the prison such as scientific data with regard to her case.

In a civil case, I have discretion to decide whether to recruit a lawyer for someone who cannot afford one. *Navejar v. Iyola*, 718 F.3d 692, 696 (7th Cir. 2013); 28 U.S.C § 1915(e)(1); *Ray v. Wexford Health Sources, Inc.*, 706 F.3d 864, 866-67 (7th Cir. 2013). First, however, the person has to make a reasonable effort to hire private counsel on their own. *Pruitt v. Mote*, 503 F.3d 647, 653 (7th Cir. 2007). After that person makes a reasonable attempt to hire counsel, I then must decide "whether the difficulty of the case – factually and legally – exceeds the particular plaintiff's capacity as a layperson to coherently present it." *Navejar*, 718 F.3d at 696 (citing *Pruitt*, 503 F.3d at 655). To decide that, I look, not only at the plaintiff's ability to try her case, but also at her ability to perform other "tasks that normally attend litigation," such as "evidence gathering" and "preparing and responding to motions." *Id*.

Here, plaintiff does not state that she attempted to find an attorney on her own. She does attach three letters to her motion that appear to evince her attempts to secure one. Notwithstanding the lack of clarity on this issue, I will deny plaintiff's request to appoint counsel for the following two reasons. First, plaintiff has been allowed to amend her complaint. So the complexity of this matter as well as the number of defendants has yet to be determined. Second, plaintiff asserts in her complaint that "she knows about the DOC's polices, rules and regulations" and alleges a clear understanding of her constitutional rights. Docket No. 1 ¶ 30. Therefore, plaintiff is competent to amend her complaint without the assistance of counsel.  I will deny without prejudice plaintiff's motion to appoint counsel.

## IV. Motion to Allow Use of Release Account

Plaintiff has also moved to be allowed used of release account funds to pay for copies, postage, and other legal expenses. She states that she has depleted all of the legal loans available to her, and the use of her release account funds will allow her to finance this case.

I will deny plaintiff's motion. There is no federal law permitting me to require state officials to allow prisoners use of release account funds for litigation costs. Although the Prison Litigation Reform Act permits me to order an institution to access a prisoner's release account to pay an initial partial filing fee, such fees are required to proceed with the case. *See, e.g., Mosby v. Wommack*, No. 08-cv-677, 2009 WL 2488011 (W.D. Wis. Aug. 12, 2009) ("[W]ith the exception of initial partial payments, [federal district courts] do not have the authority to tell state officials whether and to what extent a prisoner

should be able to withdraw money from his release account."); *see also Artis v. Meisner*, No. 12-cv-589, 2015 WL 5749785, at *5-6 (W.D. Wis. Sept. 30, 2015) ("Absent some authority *requiring* the prison to disburse [petitioner's] release account funds, the court declines to interfere in the administration of Wisconsin state prisons . . . ." (emphasis in original)). I will not undermine the intent behind the concept of the prisoner release account by allowing the plaintiff to access the release account to fund litigation costs. *See* Wis. Adm. Code. § DOC 309.466 (stating that disbursements from a prisoner's release account are authorized "for purposes that will aid the inmate's reintegration into the community").

## V. CONCLUSION

**IT IS THEREFORE ORDERED** that plaintiff's motion for leave to proceed without prepayment of the filing fee (Docket No. 2) is **GRANTED**.

**IT IS FURTHER ORDER** that plaintiff's motion to appoint counsel (Docket No. 4) is **DENIED.**

**IT IS ALSO ORDERED** that plaintiff's motion to allow use of release account fund (Docket No. 9) is **DENIED**.

**IT IS FURTHER ORDERED** that on or before **April 7, 2018**, plaintiff shall file an amended pleading curing the defects in the original complaint as described herein.

**IT IS FURTHER ORDERED** that the agency having custody of plaintiff shall collect from his institution trust account the $349.03 balance of the filing fee by collecting monthly payments from plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to plaintiff's trust account and forwarding

payments to the Clerk of Court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. § 1915(b)(2). The payments shall be clearly identified by the case name and number assigned to this action. If plaintiff is transferred to another institution, county, state, or federal, the transferring institution shall forward a copy of this order along with plaintiff's remaining balance to the receiving institution.

**IT IS ALSO ORDERED** that a copy of this order be sent to the officer in charge of the agency where plaintiff is confined.

**IT IS FURTHER ORDERED** that plaintiff shall submit all correspondence and legal material to:

> Office of the Clerk
> United States District Court
> Eastern District of Wisconsin
> 362 United States Courthouse
> 517 E. Wisconsin Avenue
> Milwaukee, Wisconsin 53202

PLEASE DO NOT MAIL ANYTHING DIRECTLY TO THE COURT'S CHAMBERS. It will only delay the processing of the matter.

Plaintiff is further advised that failure to make a timely submission may result in the dismissal of this action for failure to prosecute. In addition, the parties must notify the Clerk of Court of any change of address. Failure to do so could result in orders or other information not being timely delivered, thus affecting the legal rights of the parties.

Dated at Milwaukee, Wisconsin, this 13th day of March, 2018.

s/Lynn Adelman
LYNN ADELMAN
District Judge

22